# MELVYN K. ROTH

ATTORNEY AT LAW

SUITE 501

666 OLD COUNTRY ROAD

GARDEN CITY, NEW YORK 11530-2004

(516) 683-8400

TELECOPIER

(516) 683-8410

May 16, 2006

<u>Via ECF</u>

Honorable Allyne R. Ross
United States District Judge
United States District Court
Eastern District of New York
225 Cadman Plaza East
Brooklyn, NY 11201

*[handwritten annotation: The court adopts the - the recommendation & requested in this letter grants the 30 day extension of time to surrender. So ordered. /s/ ARR 5/22/06 CC: Counsel]*

Re:    United States v Lloyd McKend
       Case Number CR 03-1368 (ARR)

Dear Judge Ross:

As you may recall, on April 13, 2006 you sentenced Lloyd McKend to 21 months incarceration. At that time I had requested that the Court recommend a Federal Prison Camp, which is a minimum-level security institution. (A copy of the Transcript of Sentence is enclosed herein) According to my research, it is the Federal Bureau of Prisons' policy to place an individual in the least restrictive facility for which he or she qualifies. I believe Lloyd McKend qualifies for such a facility.

The Court's Judgment states that the recommendation is "that the defendant be housed at a facility in the metropolitan area." Unfortunately, on today's date I learned that Mr. McKend has been designated to the Metropolitan Detention Center in Brooklyn. This is a restrictive administrative facility, where most of the inmates are awaiting trial or sentencing.

The defendant's voluntary surrender date is May 24, 2006. I would respectfully ask the court to amend the Judgment to recommend a Federal Prison Camp in close proximity to the defendant's home. I would also ask that the Court extend the date for the defendant's surrender for 30 days, which would allow the Bureau of Prisons time to designate a Camp.

C|M

1  UNITED STATES DISTRICT COURT
   EASTERN DISTRICT OF NEW YORK
2  ----------------------------------------x
   UNITED STATES OF AMERICA,
3                    Plaintiff,

                                      03 CR 1368
4

5          versus          United States Courthouse
                           225 Cadman Plaza East
6                          Brooklyn, N.Y.  11201
   LLOYD McKEND,
7
                   DEFENDANT.
8
   ----------------------------------------x
9
                                  April 13,  2006
10                                11:25 a.m.
           TRANSCRIPT OF SENTENCE
11 Before:  HON. ALLYNE R. ROSS,
                             DISTRICT COURT JUDGE
12
                      APPEARANCES
13
   ROSLYNN R. MAUSKOPF
14 United States Attorney - Eastern District of New York
   One Pierrepont Plaza
15 Brooklyn, New York  11201
           STEVEN D'ALESSANDRO, ESQ.
16

17 Assistant United States Attorney

18 ATTORNEY FOR DEFENDANT:

19 MELVIN ROTH, ESQ.

20

21
   Court Reporter:  ALLAN R. SHERMAN, CSR, RPR
22                  225 Cadman Plaza East Rm 374
                    Brooklyn, New York  11201
23                  Tel: (718) 260-2529  Fax: (718) 254-7237

24

25 Proceedings recorded by mechanical stenography, transcription
   by CAT.

1          THE COURT:  Turning first to the advisory

2     guidelines, the parties agree that defendant's base offense

3     level is 30, that he is entitled to a safety valve deduction

4     of two levels and a deduction for acceptance of responsibility

5     of three levels.  The only guidelines dispute is whether he is

6     entitled to a minor role adjustment only or to a adjustment

7     for minimal role.

8          The scheme in which McKend took part was organized

9     by cooperating coconspirator Tyrone Brown under pressure from

10    Persaud, a Guyanese cocaine supplier.

11         In May of 2003, Brown contacted cooperating

12    coconspirator Selwyn Smith and the two arranged a cocaine

13    importation scheme on North American Airlines planes

14    originating in Guyana and landing at John F. Kennedy Airport.

15    The cocaine would be secreted under the ice in the passenger

16    compartment of the plane, a method devised by Smith.

17         Smith, an employee of Flying Foods at JFK, whose job

18    it was to coordinate flights, decater planes and drive a

19    Flying Foods van decatered among others, North American

20    flights and was thus able to off-load the cocaine shipments

21    and remove them from the airport to his apartment, ultimately

22    delivering them at Brown's direction to a drug contact in New

23    York.

24         Brown testified that between May and November of

25    2003, the scheme was responsible for two to three shipments of

cocaine per week for an approximate total number of 60 shipments. According Smith's testimony, the shipments occurred twice a week for approximately three to four months for a total of approximately 25 to 30 shipments. Both Brown and Smith testified that Smith recruited his cousin, defendant Lloyd McKend, who had held the same job as Smith's at Flying Foods, to assist Smith in performing his duties in the scheme.

According to Smith, he, Smith, received $30,000 per shipment and from that, he paid McKend an unspecified amount for McKend's assistance. Neither Brown nor Smith testified to the number of occasions on which McKend gave Smith his assistance.

At defendant's proffer with the government, which the government has accepted as a candid account of his involvement, Mr. McKend acknowledged that his cousin Selwyn Smith recruited him into the scheme to import cocaine from Guyana via North American flights, secreting it in the ice bin of the plane's passenger compartment.

Defendant said that he assisted Smith on approximately four to five occasions by providing him the schematics of the aircraft and the time of arrival of the flights. He also admitted accompanying Smith to a plane several times in a separate car and watching him retrieve the cocaine from the ice bucket and drive it back to Flying Foods before removing it from the airport.

1       McKend told the government that he was paid two to

2 $3,000 on each occasion, receiving a total of $12,000 for his

3 involvement in the conspiracy.

4       In urging that the defendant's role reduction should

5 be limited to a minor one rather than a minimal one the

6 government characterizes defendant's role as "pivotal" to the

7 venture. It bases this conclusion on defendant's admissions

8 that he provided Smith with the schematics of the arriving

9 North American planes presumably showing the location of the

10 ice bucket in the passenger compartment, and he told Smith of

11 the arrival time of the flights and he accompanied Smith to

12 the quote staging area."

13       The record, however, is far from clear that McKend's

14 contribution even begins to approach the value and the

15 uniqueness the government would attribute to it. Certainly,

16 McKend's accompanying Smith to the staging area on several

17 occasions was a minimal contribution to the conspiracy at

18 best, especially in the absence of evidence that defendant

19 affirmatively assisted Smith beyond his mere presence on those

20 occasions when he joined him.

21       Further, the record establishes that McKend and

22 Smith held the identical job positions at Flying Foods.

23 Hence, there is no reason to believe that Smith was not

24 himself in a position to glean the identical intelligence,

25 that is, the location of the ice bin and flight arrival times

1    of airplanes that he asked his cousin to provide.

2              Presumably, Smith must have acquired this

3    information on his own with respect to those shipments when he

4    did not involve McKend.

5              The extremely limited scope of McKend's involvement

6    is also reflected in the payments he received, 2 to $3,000 per

7    shipment as compared with Smith's $30,000 per shipment

8    compensation.  That Smith chose to involve his cousin in the

9    conspiracy by assigning to him tasks that Smith could have and

10   presumably did just as easily accomplish on his own seems best

11   explained by a statement made by Brown to another participant

12   in the conspiracy in a taped conversation on October 18, 2003.

13   Brown explained to this coconspirator that Smith "Just use him

14   [that is the defendant Lloyd McKend] sometime to help him out.

15   He tried to hook him up because is his cousin, you

16   understand".

17             In another intercepted conversation two lays later,

18   Smith and Brown, apparently referring to the defendant -- I

19   can't recall which one of them said it one said, "For his

20   first position, he don't know, you know what I'm saying.  We

21   been at this shit since 92."

22             In sum, I conclude that defendant's role in the

23   conspiracy was at most minimal, warranting a four level

24   deduction notwithstanding the fact that he obviously received

25   information from his cousin about the conspiracy and possibly

1  even the scope of the conspiracy. This does not reflect on

2  the scope of defendant's role but rather his intimacy with his

3  cousin who communicated the information.

4      Accordingly, I find that under the advisory

5  guidelines, the defendant's adjusted offense level is 21,

6  which at criminal history category one calls for a range of

7  imprisonment of 37 to 46 months.

8      I note, however, that even if defendant were not

9  entitled to so great a role reduction under the advisory

10 guidelines, that would not for reasons expressed in this

11 opinion, affect my view of an appropriate sentence under

12 3553(a), but I have considered the guideline.

13      Turning to the nature and circumstances of the

14 offense, I have concluded, as is evident from the prior

15 discussion, that defendant's role in this offense was not only

16 a minimal one, in the context of this drug conspiracy and

17 other drug conspiracies of similar nature, defendant's role

18 was an extraordinarily limited one and I view this factor as

19 mitigating seriousness of defendant's offense.

20      On the other hand, in considering the nature and

21 circumstances of the offense, I have in the case of Mr.

22 McKend, similarly to the other airport employee defendants,

23 considered as an exacerbating factor the fact that defendant

24 made use of his job position at JFK Airport in committing the

25 crime of which he was convicted.

Although I have found that the government failed to
present evidence sufficient to find by a preponderance that
law enforcement authorities in fact reposed trust in the
airport employees, a finding essential to the imposition of
the abuse of trust enhancement under the guidelines.  There is
ample evidence in the record to establish that defendant took
advantage of his job in committing this offense, a job though
not established to be a repository of trust by law
enforcement, is nonetheless a highly sensitive one due to the
enhanced societal dangers posed by corruption at a major
international port or airport such as John F. Kennedy Airport.

On the whole, while defendant's crime was serious
and was exacerbated by the fact that in committing it he took
advantage of his sensitive position at a major airport, that
seriousness is mitigated somewhat by his dramatically limited
role and the fact that no weapon or violence of any kind was
committed.

Turning to the history and characteristics of the
defendant, Mr. McKend is a 35 year old United States citizen
who is divorced but financially supports his ten-year-old
daughter and four-year old child.  Family members,
specifically defendant's parents, both view defendant as an
impressionable person.  He is very close to his cousin Selwyn
Smith and thus easily influenced by him.

As noted above, it is true that the only

1  coconspirator with whom McKend had any contact is Smith, and

2  that given the conspiracy's lack of need for McKend's

3  services, the only reasonable explanation for his recruitment

4  into the scheme is Smith's misguided desire to "help out" his

5  cousin.

6        By his own estimation, Smith earned an estimated

7  750,000 to $900,000 from this scheme, that is $30,000 for each

8  of 25 to 30 shipment, yet there is no evidence that McKend was

9  paid more than a total of $12,000 that he admitted receiving

10  at his proffer.

11        Letters from family and friends state that defendant

12  -- I'm sorry the defendant has an infant son from a present

13  relationship and has been indispensable to his mother who has

14  suffered a catastrophic stroke.  The letters also emphasize

15  how hard working defendant has been to insure that his family

16  is cared for.

17        Given all the facts and circumstances pertaining to

18  the defendant and his offense, I believe that a sentence of 21

19  months is sufficient but not unduly severe to accomplish the

20  goals of sentencing enumerated in Section 3553(a).

21        The crime in which defendant became involved is a

22  serious one but in light of the limitation of defendant's

23  involvement, a prison term of almost two years is ample to

24  serve the goal of just punishment.

25        Further, the facts and circumstances of this case

1  point to an extraordinarily low risk of recidivism suggesting

2  that the selected sentence amply serves the goal of specific

3  deterrence and insures that the sentence imposed does not

4  create unwanted disparities.

5          Under the circumstances, I believe this term of

6  imprisonment is also of sufficient severity to serve as a

7  deterrent to other airport employees who might otherwise

8  succumb to the temptation to corrupt their sensitive positions

9  for pecuniary or other personal gain.

10         I therefore sentence Mr. McKend to the custody of

11 the Attorney General for a period of 21 months, to be followed

12 by a five year period of supervised release.

13         As I recall, there is a 5,000-dollar forfeiture, is

14 that correct?

15         MR. KING:  Yes, your Honor.  A preliminary order was

16 filed in August.

17         We ask that it be made part of the J and C.

18         THE COURT:  I will impose a 5,000 dollar forfeiture.

19         I gather it has already been paid?

20         MR. KING:  Yes, your Honor, it has.

21         THE COURT:  As a special condition of supervised

22 release, I prohibit the possession of a firearm.  Unlike the

23 forfeiture, I make a finding that he is unable to pay a fine,

24 but I will impose the mandatory 100-dollar special assessment.

25         MR. ROTH:  Judge, may I ask for a voluntary

1    surrender?

2                   THE COURT:  Yes.

3                   MR. ROTH:   I believe the Court has been using May

4    24th as the date.

5                   THE COURT:  Whatever Dennis says.

6                   MR. D'ALESSANDRO:   The defendant pled to a third

7    superseding indictment.  To the extent there are outstanding

8    counts as to that indictment, I know there are underlying

9    indictments, we move that they be dismissed.

10                  THE COURT:  The motion is granted.

11                  Mr. McKend, there are circumstances in which a

12   defendant may appeal the sentence.  I don't believe it will

13   apply in your case but if you choose to appeal, a notice of

14   appeal must be filed within 10 days and if you couldn't afford

15   a lawyer, an attorney would be appointed to represent you.

16                  MR. ROTH:   Judge, May 24th is acceptable to the

17   Court?

18                  THE COURT:  That is fine.

19                  MR. ROTH:   One other request.

20                  Would the Court recommend a camp in light of the

21   sentence in close proximity to his home, without a specific

22   facility.

23                  That way --

24                  THE COURT:  A camp?

25                  Is that a term of art?

MR. ROTH:  A federal prison camp.

THE COURT:  That he be designated to a facility as close as possible to his home.

MR. ROTH:  Thank you.

(Matter concluded.)